**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

May 19, 2026

**BY CM/ECF**

The Honorable Laura Taylor Swain
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, NY 10007

**Re: *United States v. Laquan Williams*, 24 Cr. 317 (LTS)**

Dear Judge Swain:

Defendant Laquan Williams is scheduled to be sentenced on May 26, 2026 at 11:00 a.m., after pleading guilty to participating in a bank fraud conspiracy, in violation of 18 U.S.C. § 1349, and aggravated identity theft, in violation of 18 U.S.C. §§ 1028A and 2. For nearly two decades, the defendant has engaged in essentially nonstop criminal behavior whenever he is in the community, and the sophistication, brazenness, and harm caused by his crimes has only increased with every conviction and sentence. Most recently, the defendant participated in a series of bank fraud schemes involving his possession of over 1,000 stolen or counterfeit checks, his manufacturing of over 500 counterfeit state and federal identification cards, over $30 million in intended loss, at least $1.8 million in actual losses to financial institutions, and the possession of two loaded guns and hollow-tip ammunition. Perhaps most concerning, this conduct occurred while the defendant was on supervised release after Judge Koeltl imposed a sentence of 64 months' imprisonment for nearly identical conduct. At that sentencing, the defendant promised that he would never engage in criminal conduct again. His subsequent actions have proven those words to be a lie. For the reasons set forth below, the Government believes that a sentence of at least 180 months' imprisonment is necessary to satisfy the purposes of sentencing set forth in 18 U.S.C. § 3553(a).

## I. Background

### A. Procedural History

In or around May 2017, Defendant Laquan Williams was charged in the Southern District of New York with participating in a bank fraud conspiracy, in violation of 18 U.S.C. § 1349, and aggravated identity theft, in violation of 18 U.S.C. § 1028A. *See United States v. Laquan Williams*, 17 Cr. 402 (JGK). These charges related to the defendant's role between 2015 and 2016 as the leader and organizer of several interrelated schemes to steal money from banks by impersonating

bank customers and withdrawing money from their bank accounts. For example, between November 2015 and January 2016, the defendant participated in a fraud scheme with his co-defendant Anise Downing, who was employed as an assistant head teller at a prominent bank in Staten Island. Downing provided bank customer information to the defendant, who then instructed co-defendant Felix Rosario to impersonate those customers and withdraw money from their accounts or make large purchases at department stores. Similarly, the defendant also gained access to photocopies of checks from an associate of co-defendant Courtney Graves—who worked in the credentialing department of a hospital in Manhattan. Using the account information from these stolen checks, the defendant again sent co-defendant Felix Rosario into various bank branches to withdraw money from customer bank accounts without authorization. Finally, the defendant also engaged in a scheme with co-defendant Jason Edwards to deposit counterfeit or altered checks into bank accounts controlled by members of the scheme. In May 2018, Judge Koeltl sentenced the defendant to 64 months' imprisonment—a substantial downward variance below the Guidelines range of 81 to 95 months' imprisonment. The defendant commenced supervised release in New Jersey in January 2022. (PSR ¶ 69). As further discussed below, the Government believes that the defendant's participation in the instant offense began as early as October 2021—while the defendant was still technically in BOP custody and serving the remainder of his sentence in the community.

**B. Offense Conduct and the Indictment**

Based on an investigation by the United States Secret Service ("USSS") and the New York City Police Department ("NYPD"), law enforcement officers collected evidence demonstrated that the defendant again served as the leader and organizer of a series of schemes to steal money from banks by impersonating bank customers between 2021 and 2024, as described below:

<u>Scheme 1 (May 2023 – June 2023)</u>: Between May 2023 and June 2023, the defendant sent two different co-conspirators ("CC-1" and "CC-2") into various banks located in New York, New Jersey, and Connecticut to impersonate various bank customers and deposit checks that would transfer money from the victims into bank accounts controlled by members of the scheme. (PSR ¶¶ 8-18). One of the victims ("Victim-1") was a well-known and prominent federal government official. (PSR ¶ 8). Based on a cellphone seized from the defendant in December 2023, law enforcement officers discovered text messages containing the defendant's instructions to the impersonators walking into the banks. Cell site location for the defendant's cellphone also showed that the defendant was in the vicinity of the fraudulent transactions that were occurring—managing and instructing CC-1 and CC-2 on what to do from outside the banks. (PSR ¶ ¶ 11, 14). The defendant also attempted to impersonate Victim-1 while calling a bank and attempted to transfer money between Victim-1's accounts, including by using Victim-1's social security number. (PSR ¶ 12). CC-1 and CC-2 were eventually arrested by law enforcement officers in Greenwich, Connecticut. (PSR ¶ 11). Total intended losses related to this scheme included approximately $827,568.33, and actual losses were approximately $43,361.28.

<u>Scheme 2 (September 2023 – November 2023)</u>: Between September 2023 and November 2023, the defendant sent another co-conspirator ("CC-3") into various banks in New Jersey and New York to impersonate the owners of various small businesses. CC-3 would request that the banks transfer funds from the victims' business bank accounts into new business bank accounts

that were opened with very similar names and controlled by the defendant. (PSR ¶¶ 19-28). Once the money was transferred, the defendant would withdraw the money as cash or transfer the money through CashApp. Law enforcement officers discovered text messages on the defendant's cellphone containing the defendant's instructions to CC-3 regarding how to carry out the fraud. (PSR ¶ 27). Total intended losses related to this scheme included approximately $218,123.22, and actual losses were approximately $87,761.08.

Scheme 3 (October 2021[1] – May 2024): Law enforcement officers also discovered text messages from the defendant's cellphone showing his involvement in a scheme to steal money from the United States by depositing stolen U.S. Treasury checks—valued at up to $13.9 million—into bank accounts controlled by the scheme. Members of the scheme recruited co-conspirators to impersonate the owners of the entities that were the payees on the stolen U.S. Treasury checks and to deposit the stolen checks into bank accounts that were controlled by members of the scheme and had been opened for the specific purpose of cashing the stolen treasury checks. For example, on or about October 26, 2023, another member of the scheme with the alias "EON" sent a photograph of a female co-conspirator ("CC-4") and the name, date of birth, and social security number of a particular female victim ("Victim-9"). *See* Text Messages Between Defendant and EON, attached hereto as Exhibit A, at 180.[2] In the months leading up to these messages, the defendant and "EON" had exchanged numerous photographs of real and fake driver's licenses, as well as headshots of co-conspirators like CC-4 that were going into banks to impersonate other customers. *See generally* Exhibit A. "EON" and the defendant also exchanged photographs of stolen U.S. Treasury checks, including a photograph containing multiple stolen checks, each valued at over $1 million, as depicted below:




[1] The PSR indicates that the scheme began in November 2023, but the text messages on the defendant's cellphone show that the defendant began conspiring to commit bank fraud with "EON" as early as October 2021.

[2] Because Exhibit A contains personal identifying information for victims, the Government respectfully requests that Exhibit A be filed under seal.

On November 4, 2023, CC-4—using a fake drivers license in the name of Victim-9—successfully deposited a stolen U.S. Treasury check in the amount of $13.9 million into a bank account that had been recently opened by members of the scheme at a bank branch in Massachusetts. (PSR ¶ 29). On November 10, 2023, a series of cashier's checks were issued from that same bank account, including a $3 million check in the name of a particular victim company (the "Victim-10 Company") owned by a particular individual ("Victim-10"). On July 20, 2023, the defendant and "EON" exchanged text messages with the name of Victim-10 and an image of a stolen U.S. Treasury check in the amount of $862,844.77 in the name of the Victim-3 Company—consistent with the defendant's control of the bank accounts relating to Victim-3 and the Victim-3 Company. Additionally, the co-conspirator who attempted to deposit the $3 million cashier's check originating from the $13.9 million stolen U.S. Treasury check ("CC-5") was a male individual whose photograph was exchanged between "EON" and the defendant—consistent with the defendant's role in creating fake identification cards that CC-4 and CC-5 used when attempting to impersonate Victim-9 and Victim-10. The November 2023 check was not the only high-dollar U.S. Treasury check that the defendant and other members of the scheme attempted to deposit. In the text messages exchanged between "EON" and the defendant alone, for example, "EON" and the defendant exchanged photos of approximately 24 stolen or forged U.S. Treasury checks valued at a total of approximately $18.9 million. Similarly, in text messages exchanged between an individual named "Yim" and the defendant, on December 15, 2023, "Yim" sent a photograph of a stolen U.S. Treasury check to the defendant containing a value of over $1 million and said: "I got 9m's [i.e., $9 million]" | "And 12.9ms" [i.e., $12.9 million]. The defendant responded: "I need the 12.9." *See* Text Messages Between Defendant and Yim, attached hereto as Exhibit B, at 16-17.[3] As a result, the total intended loss from Scheme 3 is over $30 million.

Based on the text messages between "EON" and the defendant, law enforcement also identified the following counterfeit checks that resulted in actual losses:

- On or about November 10, 2021, "EON" sent a message to the defendant containing the name, last four digits of social security number, date of birth, business name, address, Tax ID, phone number, email address, and account number of a particular victim ("Victim-11") and victim company ("Victim-11 Company"). On or about November 11, 2021, "EON" sent a follow-up message to the defendant containing an image of a letter from the bank addressed to Victim-11 indicating that the bank rejected a deposit of approximately $326,000. Based on bank records, this counterfeit check, along with a second counterfeit check deposited on or about November 9, 2021, resulted in an actual loss of approximately $331.75.

- On or about December 15, 2021, "EON" asked the defendant whether "U got a litty route four biti" ("biti" rhyming with the first part of the name "Citibank"). The defendant responded by sending a photograph of a Citibank check with the payor listed as a particular company ("Victim-12 Company"). "EON" responded: "That shit look a real slip." Bank records show that between on or about November 17, 2021 and on or about December 13, 2021, approximately five counterfeit checks—including two

[3] Because Exhibit B contains personal identifying information for victims, the Government respectfully requests that Exhibit B be filed under seal.

checks matching the appearance of the check posted by the defendant—were deposited into a particular bank account, causing actual losses of approximately $194,035.50.

- On or about May 29, 2022, the defendant sent to "EON" a photograph of a stolen U.S. Treasury check in the amount of $92.198.72 in the name of a particular company ("Victim-13 Company"). On or about August 10, 2022, an identical check was deposited into a newly-created bank account in the name of the Victim-13 Company, which was followed by withdrawals prior to the check being rejected as fraudulent. This caused actual losses of approximately $47,525.40.

- On or about June 10, 2022, "EON" sent to the defendant an image of a check in the name of a particular doctor ("Victim-14"). The defendant responded "need it" and "EON" responded: "Ight 200". According to bank records, between on or about June 9, 2022 and on or about July 14, 2022, approximately seven counterfeit or forged checks totaling approximately $31,954 were deposited into two bank accounts in the name of a particular individual, including a forged check matching the appearance of the check that the defendant received from "EON". The actual losses stemming from this conduct was approximately $4,425.30.

- On or about May 18, 2022, "EON" sent to the defendant a screenshot of a particular U.S. Treasury check addressed to a particular company (the "Victim-15 Company"), and on or about June 15, 2022, "EON" sent to the defendant a photograph of a letter dated June 9, 2022 indicating that accounts were opened in the name of Victim-15 without his permission. Based on bank records, on or about May 20, 2022, a new bank account was opened in the name of the Victim-15 Company, followed by a deposit of a counterfeit check on or about May 25, 2022 in the amount of $237,359.89. The deposit was followed by cash withdrawals and actual losses of approximately $15,072.95.

- On or about September 16, 2022, "EON" sent to the defendant the name, date of birth, home address, email address, and phone number of a particular individual ("Victim-16"), and on or about November 25, 202, "EON" sent to the defendant a message stating "2021 W2 Tax Return" along with the name of Victim-16, Victim-16's business (the "Victim-16 Company"), business address, EIN, and an amount "2,217,359.66". Based on bank records, on or about October 10, 2022, a stolen U.S. Treasury check in the amount of $2,217,359.66 was deposited into a newly-opened bank account in the name of the Victim-16 Company, which was followed by a series of purchases of stock that were later cancelled as well as withdrawals and transfers. The actual losses were approximately $10,311.60.

- On or about September 20, 2022, "EON" sent to the defendant the name, drivers license number, home address, height, eye color, and weight of a particular individual ("Victim-17"). Bank records show that on or about October 6, 2022, a stolen U.S. Treasury check in the amount of $185,988.42 was deposited into a newly-created bank account, followed by withdrawals and losses totaling approximately $176,660.

- On or about June 7, 2023, the defendant sent to "EON" a document purporting to be a New York State Department of State record relating to the filing of a particular company (the "Victim-18 Company"). Bank records show that on or about June 4, 2023, a stolen U.S. treasury check in the amount of $54,996.54 into a newly-created bank account, followed by withdrawals and losses totaling approximately $4,486.

- On or about June 22, 2023, the defendant sent to "EON" a photograph of a check being issued in the name of a particular company (the "Victim-19 Company"). "EON" responded: "Ight" | "Put it together." Bank records show that on or about July 11, 2023, a counterfeit check that was created using the information from the check that the defendant sent to "EON" was deposited, causing the Victim-19 Company's bank account to receive a debit and actual losses of approximately $186,396.

- On or about July 3, 2023, the defendant sent to "EON" the name, address, date of birth, social security number, and drivers license for two different individuals, along with an image of a personal check. Bank records show that between on or about June 30, 2023 and on or about July 7, 2023, a series of approximately 17 counterfeit checks matching the appearance of the personal check from the photograph—along with four other types of checks—were deposited into bank accounts in the names of approximately five individuals, including one of the individuals that matched the information that "EON" sent to the defendant for purposes of creating fake identification.. The deposit of these counterfeit checks was quickly followed by cash withdrawals, resulting in a total loss of approximately $54,945.12.

- On or about July 17, 2023, the defendant sent to "EON" an image of a U.S. Treasury check in the amount of $929,892. "EON" responded: "Ok" | "900k". Based on bank records, a stolen U.S. Treasury check in the amount of $929,892 was deposited into a bank account in Idaho on or about November 21, 2023. Following the deposit of the stolen check, a series of wire transfers and cash withdrawals took place before the bank realized that the check was unauthorized. While many of the transactions were reversed, the fraud nonetheless resulted in a loss of approximately $454,903.21.

Actual losses stemming from the scheme amount to at least $1,157,029.78, and the intended loss exceeded $30 million. These losses were calculated merely based on the communications between "EON" and the defendant, and do not include the other text message threads that the defendant had with other members of the conspiracy relating to possible bank frauds (such as the defendant's messages with "Yim" about obtaining $9 million and $12.9 million U.S. Treasury checks). Because of time and resource constraints, law enforcement agents have not been able to identify anything close to all of the intended and actual financial losses linked to the defendant.

Search of the Defendant's Residence (May 23, 2024): Based in part on the evidence described above, on May 22, 2024, an indictment was filed charging the defendant with participating in a bank fraud conspiracy, in violation of Title 18, United States Code, Section 1349 (Count One); and aggravated identity theft, in violation of Title 18, United States Code, Sections 1028A and 2 (Count Two). (PSR ¶¶ 1-3). The defendant was arrested on May 23, 2024, and the defendant's residence was searched after law enforcement officers found bank fraud paraphernalia

in plain view and obtained a court-authorized search warrant. During the search, law enforcement officers found, among other things: (1) approximately 27 seals and holograms for placement onto identification cards; (2) a hologram identification card press; (3) approximately 1,102 blank state identification cards; (4) approximately nine stolen U.S. Treasury checks totaling approximately $506,010.83; (5) approximately 1,015 additional stolen and/or altered checks totaling approximately $3.35 million; (6) approximately 571 counterfeit identification cards, including counterfeit identification cards depicting CC-1 through CC-5, as well as the defendant's own mother; (7) approximately 524 counterfeit credit or debit cards; (8) approximately 50 stolen credit cards; (9) approximately 478 pages of blank check stock; (10) multiple printers and laminators used for printing and embossing checks and identification cards; (11) a Glock 19 9mm semi-automatic pistol; (12) a LCP Ruger .380 caliber semi-automatic pistol; and (13) approximately 19 rounds of 9mm and .380 caliber ammunition, including approximately 13 hollow-point rounds of ammunition designed to cause greater harm to human targets. Law enforcement officers also obtained a search warrant for the defendant's vehicle, which revealed, among other things: (1) a green unembossed credit card; (2) six stolen credit cards; and (3) an altered U.S. Treasury Check in the name of another individual worth approximately $7,891.52. Relevant to Scheme 3 described above, some of the counterfeit state identification cards recovered by law enforcement included photographs of CC-4 and CC-5—the individuals who had been responsible for the transactions involving the stolen $13.9 million U.S. Treasury check described above.

Law enforcement has identified the following instances of bank fraud linked to the counterfeit state and federal identification cards recovered from the defendant's residence in April 2024:

- A counterfeit Georgia drivers license in the name of a particular victim ("Victim-20") was used by an impostor on or about October 18, 2023 to withdraw approximately $123,679 in cashier's checks and $800 in cash, resulting in actual losses of approximately $124,479.

- A counterfeit U.S. passport card in the name of a particular victim ("Victim-21") was used by an impostor on or about September 25, 2023 to deposit a stolen U.S. Treasury check in the amount of approximately $1,013,597.20. The impostor withdrew and made debit card purchases in the amount of approximately $360,519.75 before the U.S. treasury check was reported as stolen and the account was frozen.

- A counterfeit New York drivers license in the name of a particular victim ("Victim-22") was used by an impostor on or about November 8, 2023 to open two new accounts in the name of Victim-22. The impostor then transferred funds from Victim-22's personal accounts to the new accounts and either withdrew or transferred approximately $28,049 before Victim-22 reported the fraud.

- A counterfeit New Jersey drivers license in the name of a particular victim ("Victim-23") was used by an impostor on or about January 26, 2023 to withdraw approximately $13,100 in cash from Victim-23's bank accounts before Victim-23 noticed the withdrawals and reported the fraud.

- A counterfeit U.S. passport card in the name of a particular victim ("Victim-24") was used by an impostor between on or about December 22, 2023 and on or about December 26, 2023 to cash three checks totaling approximately $1,584, and to withdraw $9,865 in cash before Victim-24 noticed the transactions and reported the fraud, for a total loss amount of $11,449.

These total actual losses caused by these fraudulent transactions was approximately $537,596.75.

## II. The Defendant's Plea and Applicable Guidelines Range

### A. The *Pimentel* Letter and the Presentence Investigation Report

On September 4, 2025, the defendant pleaded guilty to Counts One and Two of the Indictment. In advance of sentencing, the Government provided a letter to the defendant pursuant to *United States v. Pimentel*, 932 F.2d 1029, 1034 (2d Cir. 1991) (the "*Pimentel* Letter"), setting forth the Government's position at that time regarding the application of the United States Sentencing Guidelines ("U.S.S.G.") to the defendant's criminal conduct. Pursuant to U.S.S.G. §§ 2B1.6 and 3D1.1, the *Pimentel* Letter stated that the Guidelines sentence for Count Two is 24 months' imprisonment, to be served consecutively to any sentence imposed on Count One, and Count Two is otherwise excluded from the application of the Guidelines. Pursuant to U.S.S.G. § 2B1.1(a)(1), the *Pimentel* Letter stated that the base offense level for Count One is 7. Pursuant to U.S.S.G. § 2B1.1(b)(1)(K), the *Pimentel* Letter stated that a 20-level enhancement applies because the intended loss was more than $9.5 million but less than $25 million.[4] Pursuant to U.S.S.G. § 2B1.1(b)(2)(A)(i), the *Pimentel* Letter stated that a two-level enhancement applies because the offense involved ten or more victims. Pursuant to U.S.S.G. § 2B1.1(b)(11)(B)(i), the *Pimentel* Letter stated that a two-level enhancement applies because the offense involved the production or trafficking of unauthorized access devices or counterfeit access devices. Pursuant to U.S.S.G. § 2B1.1(b)(16), the *Pimentel* Letter stated that a two-level enhancement applies because the offense involved the possession of a dangerous weapon in connection with the offense. Pursuant to U.S.S.G. § 3B1.1, the *Pimentel* Letter stated that a four-level enhancement applies because the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive. These calculations resulted in an adjusted offense level of 37. The *Pimentel* Letter also stated that the defendant has 16 criminal history points, resulting in a Criminal History Category of VI.

In the PSR, prepared on November 24, 2025, the Probation Office similarly found that the adjusted offense level was 37. With a three-level reduction for acceptance of responsibility, the PSR calculated the total offense level as 34. Combined with a Criminal History Category of VI, this results in a Guidelines range of 262 to 327 months' imprisonment on Count One, to be followed by a consecutive 24-month sentence on Count Two, for a total Guidelines range of 286 to 351 months' imprisonment. (PSR ¶¶ 42-69, 120).

[4] As further discussed below, the Government now believes that the accurate intended loss amount is more than $25 million but less than $65 million.

As further discussed below, the Government now believes that the accurate intended loss amount is more than $25 million but less than $65 million, pursuant to U.S.S.G. § 2B1.1(b)(1)(L). As a result, the Government respectfully submits that the total offense level is 36. Combined with a Criminal History Category of VI, this results in a Guidelines range of 324 to 405 months' imprisonment on Count One. Because of the statutory maximum of 30 years' imprisonment, however, the Guidelines range on Count One is 324 to 360 months' imprisonment pursuant to U.S.S.G. § 5G1.1. The consecutive 24-month sentence on Count Two results in a total Guidelines range of 348 to 384 months' imprisonment.

**B. The Defendant's Objections to the PSR Should be Overruled**

In his sentencing submission, the defendant raises two objections to the PSR. First, the defendant objects to Paragraphs 29-32 of the PSR, alleging that he did not participate in the frauds described in these paragraphs. Second, the defendant objects to the application of a two-level enhancement for possessing firearms "in connection with" the fraud offenses under U.S.S.G. § 2B1.1(b)(16). Both of these objections should be overruled. Additionally, the Government's investigation has revealed that the intended loss amount here is actually greater than $25 million, and so the Government respectfully requests that the PSR be modified to reflect the higher intended loss amount.[5]

**1. The Intended Loss is Over $25 Million**

To begin with, the evidence overwhelmingly shows that the defendant participated in Scheme 3—a scheme to deposit stolen U.S. Treasury checks into bank accounts by impersonating the payees on the checks and depositing them into bank accounts controlled by members of the scheme. In the defendant's messages with "EON," it is clear that "EON" and the defendant were conspiring with each other to steal money from banks. For example, in or

[5] The defendant's sentencing submission suggests that the Government vindictively threatened to "go back and add additional intended loss amounts to try and drive the loss even higher" if the defendant exercised his right to object to the PSR's loss calculation. Def. Submission at 4. That allegation is both incorrect and misleading. On January 15, 2026, the parties conferred to discuss the Government's evidence relating to loss amount, including the evidence of the defendant's participation in Scheme 3. During the meeting, the Government told defense counsel that its estimate of the loss amount in the *Pimentel* Letter was extremely conservative, and if the defendant objected to the loss amount, there was a strong possibility that the Government would find additional evidence of intended or actual losses while preparing its response to the defendant's objections. The Government provided this information to defense counsel in advance of their submission deadline so that the defendant could strategically weigh whether it was in his best interest to dispute the loss amount calculations in the PSR. *Cf. Greiner v. Wells*, 417 F.3d 305, 319 (2d Cir. 2005) ("We will not normally fault counsel for foregoing a potentially fruitful course of conduct if that choice also entails a significant potential downside." (internal quotation marks omitted)); *Flores-Mendez v. United States*, 2018 WL 357311, at *3 (S.D.N.Y. Jan. 10, 2018) ("Simply put, the decision to request—or not to request—a *Fatico* hearing is a strategic one; often, counsel decides against a *Fatico* hearing to avoid the risk of worsening his or her client's outcome.").

around October 2021, "EON" sent to the defendant a photograph of a particular victim's passport, social security card, and Arizona drivers license, as well as a printout containing the address, phone numbers, bank account numbers, and employment information for the victim. *See* Exhibit A at 2. "EON" then stated: "Three account numbers there". The defendant responded: "Ok" | "Chase". "EON" responded: "Bank of America" | "What spot u like the most." The defendant responded: "Get chase like that"—indicating that he would assist in defrauding Chase Bank if "EON" were able to get similar victim information for a Chase Bank customer.

Over the course of the next two years, "EON" and the defendant exchanged hundreds of similar messages discussing potential opportunities to steal money from banks using stolen checks and personal identifying information. One of the earliest messages in which "EON" and the defendant discussed stolen U.S. Treasury checks was in in or around May 2022, when "EON" sent a screenshot of a portion of a U.S. Treasury check in the name of a third party that appeared to have been taken during a video call. *See* Exhibit A at 79. Similarly, later that month, the defendant sent to "EON" similar photographs of U.S. Treasury checks with large dollar amounts in the names of third parties. *See* Exhibit A at 82. As mentioned above, in total, "EON" and the defendant exchanged photographs with each other of approximately 24 stolen or forged U.S. Treasury checks valued at a total of approximately $18.9 million between October 2021 and December 2023. During the search of the defendant's residence in June 2024, law enforcement officers also recovered approximately 10 stolen U.S. Treasury checks valued at over $500,000—demonstrating that the defendant was clearly a participant in Scheme 3, and the defendant was aware that the purpose of the scheme was to try to deposit stolen U.S. Treasury checks with dollar values in the millions and tens of millions. Indeed, in text messages exchanged between an individual named "Yim" and the defendant, on December 15, 2023, "Yim" sent a photograph of a stolen U.S. Treasury check to the defendant containing a value of over $1 million and said: "I got 9m's [i.e., $9 million]" | "And 12.9ms" [i.e., $12.9 million]. The defendant responded: "I need the 12.9." *See* Text Messages Between Defendant and Yim, attached hereto as Exhibit B, at 11-12. Similarly, in text messages exchanged between an individual named "Professor" and the defendant, on October 26, 2023, the defendant sent a video containing hundreds of U.S. Treasury checks, *See* Video sent on October 26, 2023, attached hereto as Exhibit C.[6] A screenshot from the video is depicted below:

[6] Because Exhibit C contains personal identifying information for victims, the Government respectfully requests that Exhibit B be filed under seal.



The evidence also shows that the defendant played an important role in the deposit of the stolen $13.9 million U.S. Treasury check in November 2023 at a bank branch in Massachusetts. Specifically, the defendant's messages with "EON" show that the defendant manufactured fake identification cards that "EON" could provide to impersonators who were walking into bank branches and depositing the stolen U.S. Treasury checks in bank branches. For example, in August 2022, "EON" sent messages to the defendant stating: "Make it over" | "& let me get a passport card". "EON" also sent a message containing a headshot photograph consistent with a drivers license or passport, as well as the name, date of birth, state, and height of the victim, as well as a photograph of the back of the victim's drivers license. Approximately 90 minutes later, the defendant responded with a photograph of a person holding the back of a nearly identical drivers license, and "EON" responded: "Yea much better". *See* Exhibit A at 108-09. These messages make clear that the defendant was assisting in the bank fraud scheme by creating fake drivers licenses, passport cards, and other forms of identification that could be used by the impersonators. With respect to the $13.9 million check described in Paragraph 29 of the PSR, the defendant received from "EON" on October 26, 2023—approximately one week before the deposit of the check on November 4, 2023—a photograph of CC-4, who impersonated Victim-9 while depositing the U.S. Treasury check on November 4, 2023. *See* Exhibit A at 180-81 (containing the name, state, date of birth, social security number, and height of Victim-9, as well as driver's license-style photographs of CC-4). Following the successful deposit of this check, a cashier's check in the amount of $3,000,000 was issued payable to the Victim-10 Company. The defendant's knowledge and control over bank accounts involving the Victim-10 Company is clear based on messages exchanged between "EON" and the defendant in July 2023, when "EON" sent to the defendant the name of Victim-10, and the defendant responded with a photograph of a stolen U.S. Treasury check in the name of the Victim-10 Company. *See* Exhibit A at 173-74. Similarly, the individual who attempted to cash the $3,000,000 check—CC-5—was also someone who the defendant had previously assisted in creating a fake ID for "EON". In June 2023, "EON" sent a driver's license-style photograph of CC-5 to the defendant, along

with a height, weight, and eye color to be used to create a fake driver's license. *See* Exhibit A at 145.

Putting any doubts to rest about the defendant's role in Scheme 3, law enforcement officers recovered multiple fake driver's licenses with the photographs of both CC-4 and CC-5 while searching the defendant's residence in June 2023. *Compare* Photographs of Fake IDs, attached hereto as Exhibit D, at 1-2 *with* Exhibit A at 145, 173-74. Simply put, the evidence is overwhelming that the defendant participated in the fraud relating to the $13.9 million U.S. treasury check, or at a minimum that this conduct was at least reasonably foreseeable to him within the scope of the conspiracy. *See* U.S.S.G. § 1B1.3(a)(1)(B) (defining relevant conduct to include "all acts and omissions of others that were . . . within the scope of the jointly undertaken criminal activity, in furtherance of that criminal activity, and reasonably foreseeable in connection with that criminal activity").

For all these reasons, the Government respectfully submits that the intended loss for the defendant is well over $25 million under U.S.S.G § 2B1.1(b)(1)(L)—comprised of, among other things: (1) the $13.9 million U.S. Treasury check deposited in November 2023; (2) the approximately 24 stolen or forged U.S. Treasury checks exchanged between the defendant and "EON" valued at a total of approximately $18.9 million; (3) the 10 stolen U.S. Treasury checks recovered from the defendant's residence valued at a total of approximately $506,010.83 and approximately 1,015 additional stolen and/or altered checks recovered from the defendant's residence valued at a total of approximately $3.35 million; and (4) the intended losses from Schemes 1 and 2 totaling approximately $1 million. Based on these figures, a reasonable estimate of the defendant's intended loss here is at least approximately $36 million—not even including the defendant's messages with "Yim" described above where the defendant was talking with "Yim" about obtaining $9 million and $12.9 million U.S. Treasury checks.

### 2. The Firearms Were Possessed in Connection with the Fraud Offenses

For the defendant's second objection, the evidence clearly shows that the two firearms recovered from the defendant's residence—a stash house filled with over a thousand stolen checks, hundreds of fake identification cards, and ID card printers and hologram presses—were at least in part possessed by the defendant to protect himself from robbers who might seek to steal money or valuable bank fraud paraphernalia stored in the defendant's stash house. Both firearms were loaded and easily accessible—one was in a shoebox in the defendant's closet, and the other was found inside the pocket of a jacket hanging in the same closet. At the time of the search, the defendant also had no legitimate employment, and he admitted to the Probation Office that he was financially supporting himself by engaging in bank fraud. (PSR ¶ 106). As a result, the defendant almost certainly purchased the firearms and ammunition using proceeds from bank fraud. Meanwhile, there is no evidence whatsoever that the defendant possessed the firearms for exclusively a non-criminal purpose like hunting or self-defense that would be completely divorced from the thousands of dollars he was making from engaging in lucrative bank fraud. As the Court is aware, the Government need only prove this enhancement by a preponderance of the evidence for purposes of sentencing, *see United States v. Vaughn*, 430 F.3d 518, 520 (2d Cir. 2005), and the Government respectfully submits that the circumstantial evidence of the connection between the guns and the fraud offenses here is overwhelming:

*First*, the proximity of the two guns to the fraud paraphernalia strewn throughout the defendant's residence is very powerful circumstantial proof of the defendant's intent. *See United States v. Snow*, 462 F.3d 55, 62-63 (2d Cir. 2006) (comparing locked and inaccessible pistols used for target practice and guns readily accessible to protect drugs, drug proceeds, or the drug dealer himself); *United States v. Forbes*, 124 F. App'x 45, 47 (2d Cir. 2005) ("[E]vidence that Forbes kept the gun in a pocket of a coat owned by him and near drugs that he intended to distribute is sufficient to support the inference that Forbes possessed the gun to protect or aid his drug trafficking activities."); *United States v. Finley*, 245 F.3d 199, 203 (2d Cir. 2001) (sufficient evidence of nexus where shotgun was kept in proximity to the window from which defendant sold drugs). As mentioned above, both firearms were loaded and easily accessible to the defendant—sitting in a jacket and shoebox in the defendant's closet. Additionally, it is worth mentioning that the fraud paraphernalia was found not just in the defendant's home, but also in his vehicle—consistent with the defendant keeping a gun in his jacket while driving to various bank branches with proceeds of bank fraud in his vehicle. Indeed, the defendant has previously posted photographs of himself with large quantities of cash while seated in a vehicle:




*Second*, it is important to bear in mind that the defendant is a career fraudster with nearly two decades of experience defrauding banks, and he was notorious and well-known for being one of the most prolific bank scammers in all of New York City. The defendant's cellphone also shows that his involvement in bank fraud was not sporadic or episodic—Essentially every day, the defendant was attempting to steal money from banks from other people. The defendant also bragged about the amount of money that he made on social media, in part to gain access to additional co-conspirators who were willing to provide him access to other personal identifying information and individuals willing to walk into banks to steal money from customers. Just one example is a video posted by the defendant in December 2023, which was reposted by a Youtube user named "YouTube Bloods" with the title "Chinaman NYC BIGGEST SCAMMER SHOWS OFF MONEY AFTER INSTAGRAM SAYS HE SHOWED A FAKE 8 MILLION ATM." *See* Video of Defendant with Stacks of Cash, attached hereto as Exhibit H. In the video, the defendant is holding multiple stacks of cash in a video apparently filmed from the defendant's

residence, and then the video pans over 30 stacks of cash, nearly all of them $100 bills. Below are some stills from the video:









Other stills from publicly-posted videos containing excerpts from the defendant's public social media posts show the defendant partying at fancy lounges and carrying large quantities of cash. Below are some of these additional posts:






Simply put, it is not a coincidence that the defendant possessed two firearms in the same exact location where he was storing fake IDs, stolen credit cards, over $3 million worth of stolen checks, and his ID-making equipment and printers. All of these items were extremely valuable, and the defendant's bragging about all the money he was making on social media from his fraud activities made him a ripe target for being robbed. As a result, while it may be the case that the defendant in part had the firearms in his home for personal protection, it also defies logic that these firearms had no connection whatsoever to the defendant's bank fraud and the thousands of dollars that he was stealing from banks, which he openly advertised and boasted about on social media. Indeed, this is a case where the defendant's personal protection and protection of his criminal proceeds were completely intertwined—one of the reasons why the defendant needed personal protection was because he so ostentatiously flaunted the wealth that he was making from engaging in bank fraud. Additionally, the defendant admitted during his PSR interview that "[f]rom 2023 until his arrest for the instant offense in May 2024, the defendant was unemployed and admittedly financially supported through the criminal activity which formed the basis for the instant offense." (PSR ¶ 106). As a result, the defendant almost certainly purchased the illegal firearms and ammunition in his home with the very same money that he was making from his bank fraud proceeds. Put differently, the guns and ammunition were likely purchased using bank fraud money and were intended at least in part to protect the defendant's bank fraud operations. For these reasons, the enhancement for "possessing a dangerous weapon (including a firearm in connection with the offense" is clearly proven here by a preponderance of the evidence. U.S.S.G. § 2B1.1(b)(16).

## III. Discussion

### A. Applicable Law

Although *United States* v. *Booker* held that the Guidelines are no longer mandatory, it also held that they remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing. 543 U.S. 220, 264 (2005). As the Supreme Court stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines

range," which "should be the starting point and the initial benchmark." *Gall* v. *United States*, 552 U.S. 38, 49 (2007).

After that calculation, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant;" (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available;" (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants;" and (7) "the need to provide restitution to any victims," 18 U.S.C. § 3553(a)(1)-(7). *See Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B) to afford adequate deterrence to criminal conduct;
> (C) to protect the public from further crimes of the defendant; and
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

**B. A Sentence of at Least 180 Months' Imprisonment is Necessary in this Case.**

The Government respectfully submits that a sentence of at least 180 months' imprisonment is necessary in this case to reflect the seriousness of the defendant's conduct, promote respect for the law, and provide just punishment for the offense.

At the outset, a substantial term of incarceration is necessary to reflect the seriousness of the defendant's conduct and promote respect for the law. For nearly three years, the defendant served as a leader and organizer of a series of bank fraud scams aimed at stealing millions of dollars from innocent bank customers and financial institutions. In Schemes 1 and 2, the defendant clearly played the most essential role in the schemes—sending CC-1, CC-2, and CC-3 into bank branches all around the New York City metropolitan area with fake identification cards and counterfeit or stolen checks to steal money from the bank customers they were impersonating. The defendant personally obtained the PII and bank account information that allowed the frauds to succeed, designed and manufactured the fake identification cards they used to impersonate victims, and ultimately provided CC-1, CC-2, and CC-3 with detailed instructions regarding how to carry out the fraud at each bank branch and how to distribute the proceeds from each fraud. Similarly, with respect to Scheme 3, the defendant and "EON" worked together to fraudulently deposit stolen high-dollar U.S. Treasury checks into bank accounts that they controlled—again using imposters armed with fake identification cards and documents that the defendant manufactured from his home, where he had obtained special equipment for the manufacturing of bank fraud paraphernalia, including holograms, embossers, and card printers. Each of these schemes involved identity theft of innocent victims who had done nothing wrong, and yet the defendant sent imposters into banks

to either steal money from their accounts or try to cash U.S. Treasury checks that had been stolen from them. The defendant's participation in these schemes caused tremendous financial losses, with the intended losses exceeding $35 million, and actual losses of at least $1.7 million.

Several aspects of the defendant's participation in these schemes bear emphasis and are particularly aggravating:

*First*, the defendant's cellphone reveals that he was sending and receiving hundreds, if not thousands, of text messages and other communications on a near-daily basis relating to his bank fraud activities. Many of these communications were in large group chats on Telegram—the encrypted messaging platform frequently used by scammers to send and receive personal identifying information. In one of these message threads with a Telegram user with the username "Golden Logs", the defendant in October 2021 asked: "I would like to buy some pros" (referring to personal identifying information). The defendant then responded with the names of two individuals and their bank account information, which were "for sale" for $700 and $950, respectively. After purchasing one of these identities from "Golden Logs" by sending cryptocurrency to "Golden Logs", the "Golden Logs" user then provided the name, date of birth, social security number, phone number, home address, IP address, debit card number, expiration date, CVV, ATM PIN, and mother's maiden name for an identity theft victim. Between October 2021 and February 2023, the defendant and "Golden Logs" engaged in similar transactions where the defendant was purchasing personal identifying information for victims. *See* Golden Logs Messages, attached hereto as Exhibit E.[7] Similarly, in a message thread with a Telegram user with the username "Sunny holo," the defendant asked in or around February 2022: "hey bro I wanted to buy some holograms"—referring to holographic overlays used on state drivers licenses. "Sunny holo" then responded with a listing of all the cards, stickers, laminated overlays, and signature strips that were for sale. For over a year between in or around February 2022 and in or around January 2023, the defendant then proceeded between to purchase hundreds of cards, holograms, stickers, and templates needed to create fake identification cards that were used in the bank fraud scheme. *See* Sunny Holo Messages, attached hereto as Exhibit F.[8] As another example, in or around November 2023, the defendant was part of a 10-user Telegram group chat where dozens of sets of PII were sent into the chat, along with over 1000 credit card numbers with expiration dates, CVV, and names of the cardholders. *See* Group Chat from November 2023, attached hereto as Exhibit G. The scope of the defendant's conduct—thousands of stolen identities, thousands of stolen checks, wholesale manufacturing of fake IDs, and more than $30 million in intended loss—is staggering.

*Second*, the defendant's participation in this scheme involved specialized knowledge and access to card-making equipment and personal identifying information that ordinary criminals simply do not possess. There are not many people who understand how to create counterfeit checks, or who know how to manufacture fake state identification cards and U.S. citizenship cards

---

[7] Because Exhibit E contains personal identifying information for victims, the Government respectfully requests that Exhibit E be filed under seal.

[8] Because Exhibit F contains personal identifying information for victims, the Government respectfully requests that Exhibit E be filed under seal.

with holograms and barcodes that appear genuine. There are not many people who know how to encode, emboss, and print counterfeit credit cards and debit cards that appear to be genuine. There are not many people who know how to purchase and obtain access to victim personal identifying information and banking information to carry out a fraud, or who know how to gain access to large quantities of multi-million dollar U.S. Treasury checks. There are not many people who have the experience over decades regarding how to hijack customer bank accounts and use imposters who walk into bank branches and steal money from these accounts. The defendant possesses all of these skills and decades of knowledge in carrying out these crimes, and his specialized knowledge and sophistication makes him uniquely and especially dangerous as a bank fraudster. Because of the defendant's reputation as a successful scammer, it was also other people who frequently reached out to the defendant to commit crimes together—not the other way around. Given his notoriety as a successful scammer, the temptation will be present for the defendant throughout the rest of his life to make "easy" money by engaging in bank fraud.

*Finally*, the defendant committed these crimes during a time when banks and other financial institutions are experiencing a surge in these kinds of fraud schemes. In 2022, banks reported approximately 680,000 incidents of check fraud, nearly double what was reported in 2021,[9] and nearly 60% of banks, fintechs, and credit unions lost over $500,000 in direct fraud losses in 2023.[10] Losses caused by bank fraud also do not merely affect the individual accountholders whose bank accounts were compromised. The cost of responding and remediating these frauds by the banks get passed on to regular customers in the form of higher fees and lower interest rates for legitimate customers who are seeking to safeguard their savings at a FDIC-insured bank. These financial losses also speak nothing of the nuisances caused to innocent bank customers who are forced to close their bank accounts, obtain new social security numbers, open new bank accounts, and dispute fraudulent transactions after learning that their identities have been stolen. In 2025, the Federal Trade Commission received over 1.3 million identity theft complaints—a nearly 30% increase compared to 2023.[11] In other words, identity theft and bank fraud are causing tremendous harm to people and financial institutions in the United States, and there is a significant need for general deterrence against criminals who are contemplating whether to engage in these crimes. Courts have also generally recognized that fraud crimes "requires heavy sentences to deter because it is potentially very lucrative." *United States v. Hauptman*, 111 F.3d 48, 52 (7th Cir. 1997). "Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (internal quotation omitted). "Defendants in white collar crimes often calculate the financial gain and risk

---

[9] *See* "Why is Check Fraud Suddenly Rampant?", available at https://www.bostonfed.org/news-and-events/news/2023/08/check-fraud-rampant-mike-timoney-column-fraud-awareness-key-to-slowing-surge.aspx (last visited on May 7, 2026).

[10] *See* "Alloy's 2024 State of Fraud Benchmark Report", available at https://www.alloy.com/reports/state-of-fraud-benchmark-report-2024 (last visited on May 7, 2026).

[11] *See* Federal Trade Commission – Frand and ID Theft Maps, available at https://public.tableau.com/app/profile/federal.trade.commission/viz/FraudandIDTheftMaps/IDTheftbyState (last visited on May 15, 2026).

of loss, and white collar crime therefore can be affected and reduced with serious punishment." *Id.* All of these reasons strongly weigh in favor of a very significant term of imprisonment here to ensure that the defendant and others similarly situated are aware of the consequences of engaging in sophisticated bank frauds.

Next, the defendant's lengthy and extensive criminal record also shows that he is a danger to the community who has shown absolutely no respect for the law, even when he has been sentenced to lengthy terms of imprisonment. The defendant's criminal history dates back to November 2000 when he was just 16 years old and includes at least 10 different criminal convictions, many of them relating to fraud, stolen property, and firearms possession. Many of these crimes also occurred while the defendant was on pretrial release, parole, post-release supervision, or some other form of court supervision. For two decades, no term of imprisonment has adequately prevented the defendant from continuing to engage in criminal activity after the defendant was released.

- In September 2006, for example, the defendant was arrested after being stopped by the NYPD while driving a stolen Mercedes Benz luxury vehicle and possessing a loaded .40 caliber semi-automatic pistol. (PSR ¶ 61). *While on pretrial release*, the defendant was again arrested while driving a Lexus luxury vehicle with no license plates and with a suspended driver's license, and the defendant presented fake identification to avoid arrest. The defendant was sentenced to 9 months' imprisonment.

- Approximately six months after being released from custody, the defendant was again arrested in February 2008—this time after injuring a female victim and threatening to shoot her. (PSR ¶ 63). Less than six months later, the defendant began participating in a bank fraud scheme involving stolen and counterfeit checks, resulting in an intended loss of approximately $278,000 and an actual loss of approximately $100,000. (PSR ¶ 64). The defendant was initially arrested for his participation in these offenses in January 2010, but *while on pretrial release*, he was arrested in New Jersey for conspiring with others to use two fraudulently-obtained debit cards to deposit forged checks, resulting in intended losses of approximately $30,000 and actual losses of approximately $5,600 (PSR ¶ 65). *Again while on pretrial release for both offenses*, the defendant was arrested in New York City in January 2011 after being found in possession of a counterfeit $60,000 check. (PSR ¶ 66). *Again while on pretrial release for three different offenses*, the defendant was arrested again for driving with a suspended license and being in possession of a electronic taser. (PSR ¶ 67). The defendant received a relatively lenient sentence for all of these offenses—ultimately being sentenced to three years' imprisonment and being released to parole in April 2012. (PSR ¶ 64).

- The defendant's three-year sentence did nothing to deter him from engaging in additional bank fraud. While the defendant was on parole, a search of the defendant's residence in June 2013 revealed printing devices for making credit cards, a credit card embossing machine, computer equipment, approximately 140 stolen credit cards, approximately 75 credit cards, and dozens of forged identification cards. (PSR ¶ 68).

- *Again while on parole* and following the search of his residence, the defendant served as a leader and organizer of the bank fraud scheme that ultimately resulted in his federal charges in the Southern District of New York in May 2017. As mentioned above, these charges involved the defendant obtaining personal identifying information from a bank employee and a hospital employee and sending imposters into banks to transfer funds from the victims' accounts and make large purchases at department stores. These charges were the most serious charges that the defendant had faced to date, involving actual losses of over $200,000.

During his sentencing before Judge Koeltl, the defendant faced a Guidelines range of 81 to 95 months' imprisonment and was in Criminal History Category VI based on his extensive criminal history. *See United States v. Laquan Williams*, 17 Cr. 402 (JGK), Docket No. 115 at 20. This is what he wrote in his sentencing submission to Judge Koeltl, claiming that he was done committing crimes for the rest of his life:

> One thing that I will never forget is the guideline chart, and I can honestly say that just looking at it placed a terrible feeling in my heart which is a very scary feeling for me where I don't want to do any type of fraud or crime anymore. I know you might have heard it before, but there will not be another time for me.

*Williams*, 17 Cr. 402 (JGK), Docket No. 102-1. Significantly, the defendant claimed that he had would "never forget" the United States Sentencing Guidelines, and he claimed that understanding the consequences of bank fraud would deter him from engaging in committing fraud in the future. Despite promising to Judge Koeltl that "there will not be another time for me," however, the defendant did not even complete his sentence before beginning to commit additional crimes. While in BOP custody, the defendant received two disciplinary sanctions for possessing a hazardous tool and an unauthorized item. PSR at 22. Additionally, the defendant's cellphone shows that he began participating in fraud-related conversations with "EON" as early as October 2021—three months before he commenced his term of supervised release in January 2022. (PSR ¶ 69). Additionally, the defendant's participation in the bank fraud schemes here involve far more sophistication, far greater intended loss, and the presence of multiple loaded guns and hollow-point ammunition—dramatically more serious conduct than in any of the defendant's prior criminal convictions and an escalation from even the defendant's prior federal criminal case. It is also worth noting that the defendant's own mother was arrested five months after the defendant in Pennsylvania as a result of a forgery conviction and has a criminal history of participating in identity theft and fraud offenses, and some of the fake identification cards found in the defendant's residence had photographs of the defendant's mother—suggesting that the defendant had been involved in fraud activity with his own mother. (PSR ¶¶ 81, 83). While incarcerated in pretrial detention in this case, the defendant also called into a YouTube talk show—strongly suggesting that he has had access to contraband cellphones while in custody.[12]

---

[12] *See* CHINA MAN SPEAKS TO CHINA BRIM ABOUT ALLEGATIONS OF COOPERATING ON JEEZY MULA MURDER FOR HIRE CASE!, *available at* https://www.youtube.com/watch?v=kaagxw5Yfk0 (last visited on May 15, 2025) (defendant calling into talk show from Hudson County Jail)

In his submission, the defendant claims that he "tried to turn his life around when he returned home in January 2022" and only returned to committing crimes after his marriage became strained and his brother passed away suddenly in October 2022. (Def. Submission at 3). Similarly, during his interview with the Probation Office, the defendant claimed that "[w]hen I came home from my previous federal case, I was trying to do the right thing and live a law-abiding life." (PSR ¶ 40). The defendant also claimed that he became "angry and depressed" and "started drinking heavily and my wife left me" after his brother died in October 2022. (PSR ¶ 40, 82). As a result, the defendant claims that "I was trying to win her back and thought it would help get her love and attention if I made more money so I went back to criminal conduct, which looking back only pushed her further away." (PSR ¶ 40.

The Government respectfully submits that these statements are completely false and categorically disproven by the defendant's own cellphone, which shows that the defendant started participating in bank fraud activities again long before the death of his brother in October 2022. Rather, the defendant's fraud-related conversations began as early as October 2021—a full year before the defendant's brother died and while the defendant was still technically in BOP custody, likely either serving a term of home confinement or at a residential reentry center. Additionally, the defendant's excuse that he was trying to use the bank fraud activity to regain the love and attention of his wife also makes no sense, given his relationships with other women while he was engaging in this bank fraud activity between 2022-2024. For example, in December 2023, the defendant was with his then-girlfriend Clarisa Burgos in a car when the two of them were ambushed by shooters, which resulted in Burgos being shot in the head and killed. Text messages show that the defendant had been lured to the location by the prospect of a threesome with another woman named Chelsey Harris, who has been sentenced for her participation in the murder. *See United States v. Chelsey Harris*, 24 Cr. 541 (PAE). (PSR ¶ 13). Similarly, the PSR indicates that the defendant has been romantically involved with another woman named Jessica Guzman since 2023 (PSR ¶ 85). The defendant's romantic relationships with all these other women is inconsistent with the claim that he participated in bank fraud activities to try to impress and reunite with his wife.

Putting this entire record together, the defendant has now shown over the course of nearly two decades that he is either unwilling or unable to refrain from engaging in criminal activities while he is in the community, and he presents a future risk of using his considerable skills, experience, and knowledge to engage in bank fraud activities at any time. If he is not given an adequate sentence here, the Government has very serious concerns that the defendant will immediately go back to committing additional crimes the moment that he is released from prison, just as he did after serving his previous 64-month term. Given the defendant's complete and total disregard for the law and the financial danger that he presents to financial institutions and individual victims, the Government respectfully submits that a sentence of at least 180 months' imprisonment is necessary here to protect the public from the defendant's crimes, to reflect the seriousness of the crimes that he committed, to reflect the defendant's decades-long criminal history, and to finally put an end to the defendant's career of bank fraud and identity theft.

For all of these reasons, the Government respectfully requests that the Court impose a sentence of at least 180 months' imprisonment.

## V. Conclusion

For the reasons set forth above, the Government respectfully requests that the Court impose a sentence of at least 180 months' imprisonment, as such a sentence would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

Respectfully submitted,

JAY CLAYTON
United States Attorney

By: /s/ Andrew K. Chan
Andrew K. Chan
Assistant United States Attorney
(212) 637-1072

cc: Sarah Sacks, Esq. and David Greenfield, Esq.